IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| PIEDMONT HAWTHORNE AVIATION, INC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:04CV00835 |
| TRITECH ENVIRONMENTAL HEALTH AND SAFETY, INC., | ) ) ) ) ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

BEATY, District Judge.

I.   INTRODUCTION

Plaintiff Piedmont Hawthorne Aviation, Inc. ("Plaintiff"), a North Carolina corporation, filed this declaratory judgment action against TriTech Environmental Health and Safety, Inc. ("Defendant"), a New York corporation, seeking a declaration of rights and obligations of the parties under one or more contracts. More specifically, Plaintiff seeks a declaratory judgment as to whether an agreement between Plaintiff and Defendant required Plaintiff to utilize Defendant's services at only two facilities in New York, or whether that agreement requires Plaintiff to use Defendant's services at all of Plaintiff's locations in several states, including North Carolina. In response, Defendant filed a Motion to Dismiss, or in the alternative, to Transfer

Venue [Document #7] based upon Defendant's assertion that this Court does not have personal jurisdiction over it.

II.     FACTUAL BACKGROUND

This case arises out of a contractual relationship between the parties. Plaintiff is a general aviation company, based in Winston-Salem, North Carolina, that owns thirty-two (32) "Fixed Base Operations" ("FBOs") located throughout the United States and Canada, including five FBOs in North Carolina. These FBOs provide aviation services for private aircraft, including trained technicians and aircraft service facilities. Defendant, a New York corporation, with its sole place of business in Rochester, New York, provides the private and public sectors with technical assistance in meeting regulatory compliance obligations concerning environmental, health, and safety issues. In 2003, Mary Joy DelConte ("DelConte"), president of Defendant, learned from the Rochester newspaper that the U.S. Occupational Safety and Health Administration ("OSHA") was pursing enforcement action against Plaintiff. OSHA was seeking fines based upon Plaintiff's alleged failure to correct regulatory violations found in July 2002 at Plaintiff's FBO located at the Greater Rochester International Airport ("Rochester Airport"). After DelConte read the newspaper, she called Rick Collins ("Collins"), the General Manager at Plaintiff's Rochester FBO, to offer Defendant's services.

Subsequently, Plaintiff retained Defendant to assist in preparing for and appearing at the OSHA hearing. In preparation for the hearing, Defendant worked with Collins and Lloyd Robinson ("Robinson"), the operations manager at the Rochester FBO. Additionally, just prior

to the hearing, Defendant's representatives met in Rochester, New York with Bill Thrift ("Thrift"), Plaintiff's vice president of operations, John Lemen ("Lemen"), Plaintiff's regional manager, and Mark Urbania ("Urbania"), then senior vice president and chief financial officer of Plaintiff. At this point, Plaintiff asserts, and Defendant does not specifically deny, that DelConte knew that Plaintiff was based in North Carolina, and that both Thrift and Urbania worked at Plaintiff's corporate offices in North Carolina.

The OSHA hearing occurred in August 2003 in Buffalo, New York. During the hearing, OSHA notified Plaintiff that its investigations of Plaintiff potentially extended beyond the Rochester FBO. Therefore, immediately after the hearing, representatives of Defendant and Plaintiff met in Rochester to discuss a contract pursuant to which Defendant would assist Plaintiff in OSHA compliance. At the end of this discussion, the parties executed a Letter Agreement dated August 8, 2003, which Defendant argues provides for Defendant to service all of Plaintiff's FBOs. In contrast, Plaintiff's position is that the Letter Agreement provided for Defendant's services only at the Rochester FBO. In any case, under this agreement, Defendant was required to perform a number of site-specific activities, including: (1) on-site audits and assessments of operations; (2) on-site job hazard assessments; (3) on-site industrial hygiene surveys; (4) on-site health and safety certified training; (5) on-site environmental and health safety awareness training; (6) on-site health and safety awareness training development; and (7), on-site certified training development.

Subsequent to this Letter Agreement, Defendant proceeded to develop and implement

3

compliance plans at Plaintiff's Rochester and Syracuse FBOs.[1]  In February 2004, DelConte contacted Steve Levesque ("Levesque"), Plaintiff's new chief financial officer, to acquaint him with Defendant and the services that Defendant was providing to Plaintiff.  DelConte also contacted Carol Bates ("Bates"), Defendant's human resources manager, to discuss issues related to anticipated future work at other FBOs.  DelConte believes she talked with Levesque twice, and Bates once.  Defendant avers that it believed Levesque and Bates were located in Winston-Salem, North Carolina, but Defendant notes that DelConte called from Defendant's office in Rochester, New York.

Also in or about February 2004, Plaintiff hired a new corporate compliance manager, Bill Simpson ("Simpson"), who was to coordinate with Defendant concerning Defendant's performance of its services at the FBOs.  Defendant believes that Simpson was based in Winston-Salem, North Carolina.  After Simpson was hired, DelConte contacted Simpson to arrange a conference call with him, Thrift, and Lemen, to discuss the status of the Rochester and Syracuse projects and the timetable to move forward at other FBOs.  During this conference call, Thrift stated that the Letter Agreement did not cover all FBO locations, and the call ended.

On May 27, 2004, DelConte e-mailed Simpson, to further discuss regulatory compliance issues and the terms of the Letter Agreement.  Simpson responded by e-mail on June 3, 2004, and

---

[1]Plaintiff states that the Syracuse, New York, FBO work by Defendant was pursuant to a separate agreement reached in September 2003.  For both the Syracuse and Rochester FBOs, Plaintiff asserts that Defendant was paid $56,373.57, by thirteen (13) checks, all issued from Plaintiff's North Carolina offices on a Wachovia bank account.

stated that "all TriTech services are terminated immediately for all Piedmont Hawthorne locations." Thereafter, Defendant exchanged a few more e-mails with Thrift and Simpson seeking payment of Defendant's invoices.

Subsequently, on or about August 13, 2004, Defendant mailed Plaintiff a letter that informed Plaintiff of an alleged breach of contract, referred to the matter as "[TriTech] v. Piedmont Hawthorne," demanded a response within ten days, and demanded immediate payment of $832,000 for potential services it would have provided under the Letter Agreement. However, there is no question that no services were ever provided by Defendant to Plaintiff in North Carolina.

Based upon these facts, Defendant argues that Plaintiff cannot make out a prima facie case of personal jurisdiction. Additionally, Defendant argues that venue in this Court is improper. Even if there is personal jurisdiction and proper venue, Defendant argues that this Court should decline jurisdiction pursuant to 28 U.S.C. § 2201, because of Plaintiff's improper rush to the court house in light of Defendant's demand letter. Finally, notwithstanding its arguments for dismissal for lack of personal jurisdiction, Defendant argues that based upon 28 U.S.C. § 1404(a), the Court should transfer the case to the Northern District of New York for the convenience of parties and witnesses, and in the interests of justice.

For the reasons stated herein, the Court will order that the matter be transferred to the Northern District of New York based upon 28 U.S.C. § 1404(a).

III.   MOTION TO TRANSFER VENUE

Whether there is personal jurisdiction in this case over Defendant in North Carolina is a substantial question. However, this Court need not resolve it in order to consider Defendant's alternate motion to transfer this case to New York based upon convenience to the parties and in the interests of justice. See Datasouth Computer Corp. v. Three Dimensional Technologies, Inc., 719 F. Supp. 446, 450 (W.D.N.C. 1989) ("Although this [c]ourt may not have personal jurisdiction over [defendant], it still has the power to transfer the action to another district pursuant to Section 1404(a)."); see also Hernandez v. Graebel Van Lines, 761 F. Supp. 983, 992 (E.D.N.Y. 1991) (finding that within the Second Circuit Court of Appeals, the court's power to transfer is unaffected by the lack of in personam jurisdiction over the defendant); Ulman v. Boulevard Enters., Inc., 638 F. Supp. 813, 815 & n.7 (D. Md. 1986) ("Where personal jurisdiction is lacking but venue is present, the original forum court has the authority to transfer pursuant to and in accordance with 28 U.S.C. § 1404(a), provided, of course, that subject matter jurisdiction exists in the original forum court."). Thus, while a detailed discussion of personal jurisdiction is not necessary, venue must still have been proper in this Court under 28 U.S.C. § 1391(a) in order to transfer the case under § 1404(a). See Ulman, 638 F. Supp. at 815 & n.7.

Under 28 U.S.C. § 1391, venue is proper in a judicial district where Defendant resides or where a substantial part of the events giving rise to the claim occurred. The Court finds that Defendant does not reside in North Carolina, in that Defendant's principal place of business is in Rochester, New York. However, the Court notes that a substantial part of the events giving

rise to the claim occurred in Winston-Salem, North Carolina. While the initial contract was negotiated and signed in New York, Defendant's president DelConte called and wrote to Plaintiff's managers, knowing that they were located in Winston-Salem, North Carolina, in order to, in Defendants's view, enforce the contract as written, or, in Plaintiff's view, to expand Defendant's business into North Carolina. It was during one of these phone conversations in which Plaintiff's manager Bill Simpson, located in North Carolina, informed DelConte that in Plaintiff's view, the contract did not apply to any sites outside of New York, including the five sites in North Carolina. Therefore, if there was a breach of this contract by Plaintiff, it occurred in North Carolina when Plaintiff repudiated Defendant's purported contract to provide services to sites other than Rochester and Syracuse.

As previously stated, under 28 U.S.C. § 1391, in order for venue to be appropriate, a substantial portion of the events "giving rise" to Plaintiff's claim must have occurred in this District. That does not mean, however, that "a majority of the events . . . [must] take place here, nor that the challenged forum be the best forum for the lawsuit to be venued." Park Inn Int'l, L.L.C. v. Mody Enters., Inc., 105 F. Supp. 2d 370, 376 (D.N.J. 2000). Plaintiff brings this declaratory judgment action to answer the question of whether the contract between the parties included sites outside of New York. Plaintiff has five sites in North Carolina where Defendant takes the position that it had contracted to perform services. Plaintiff would not have brought this declaratory judgment action absent Defendant's letter demanding payment for these North Carolina sites, among others. Accordingly, the Court finds that a substantial portion of the

7

Case 1:04-cv-00835-JAB   Document 13   Filed 11/22/05   Page 7 of 13

events giving rise to Plaintiff's claim, that is, Defendant's attempts to expand the contract into North Carolina and Plaintiff's repudiation of the contract, occurred within the Middle District of North Carolina, and therefore venue would be proper in the Middle District of North Carolina. Because venue exists here, the Court may now consider whether this case should be transferred pursuant to 28 U.S.C. § 1404(a).

Section 1404(a) provides that: "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." See Brown v. Flowers, 297 F. Supp. 2d 846, 850 (M.D.N.C. 2003); Plant Genetic Sys., N.V. v. Ciba Seeds, 933 F. Supp. 519, 527 (M.D.N.C. 1996); Datasouth Computer, 719 F. Supp. at 450. The parties do not dispute that this case could have been brought in the United States District Court for the Northern District of New York.[2] Since venue would be proper in either court, in considering a motion to transfer under 28 U.S.C. § 1404(a), the following discretionary factors should be considered by the Court:

> (1) the plaintiff's initial choice of forum; (2) relative ease of access to sources of proof; (3) availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing and unwilling witnesses; (4) possibility of a view of the premises, if appropriate; (5) enforceability of a judgment, if one is obtained; (6) relative advantage and obstacles to a fair trial; (7) other practical problems that

---

[2] Upon review of this matter, the Court finds that venue in the Northern District of New York is in fact appropriate here for the following reasons: Defendant's principal place of business is located within that jurisdiction, the amount in controversy exceeds $75,000, and Plaintiff has substantial contacts in New York regarding this contract, ensuring personal jurisdiction. Plaintiff seemingly does not contest this fact as Plaintiff has not presented any argument that it would not be subject to personal jurisdiction within the Northern District of New York.

> make a trial easy, expeditious, and inexpensive; (8) administrative difficulties of court congestion; (9) local interest in having localized controversies settled at home; (10) appropriateness in having a trial of a diversity case in a forum that is at home with the state law that must govern the action; and (11) avoidance of unnecessary problems with conflicts of laws.

Brown, 297 F. Supp. 2d at 850.

Defendant has asked this Court to transfer the Complaint based upon 28 U.S.C. § 1404(a). Defendant asserts that it would be more convenient to have this case proceed in the Northern District of New York, and that Plaintiff would not be inconvenienced by this transfer. Defendant asserts that the Northern District of New York would generally be more convenient for the parties and the witnesses. More specifically, Defendant states that all of Defendant's employees with knowledge concerning this dispute are located in New York. Furthermore, Defendant states that Plaintiff's employees Rick Collins (Plaintiff's General Manager at the Rochester FBO) and Lloyd Robinson (Plaintiff's operations manager at the Rochester FBO), who have knowledge concerning the negotiation of the agreement, are located in New York. Additionally, John Lemen, who signed the contract for Plaintiff, no longer works for Plaintiff and has moved to New Jersey, a fact which favors neither New York nor North Carolina. Finally, Defendant asserts that it is possible that certain OSHA employees in New York may be witnesses to this matter.[3]

---

[3] While Plaintiff states in its Response to the Motion to Dismiss that it is unlikely that any OSHA officials might be witnesses because none were involved in contract negotiations, the Court notes that Defendant alleges that OSHA made clear during the hearing that its investigation of Plaintiff potentially extended beyond the Rochester FBO and that during the

9

In response, Plaintiff asserts first that Mark Urbania, identified by Defendant as having been involved in negotiating the contract, no longer works for Plaintiff but lives in Greensboro, North Carolina. Therefore, keeping the case in North Carolina would help ensure that Urbania is available to testify at trial. Second, Plaintiff notes that proceedings in North Carolina would be more convenient for Plaintiff because its corporate headquarters are located here. Third, Plaintiff notes that Bill Thrift, Bill Simpson, Carol Levesque, and Steve Bates all live in this District. Fourth, Plaintiff asserts that a transfer to New York would merely shift any inconvenience from Defendant to Plaintiff, and such is an impermissible reason for granting a transfer of venue. See Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc., 304 F. Supp. 2d 769, 773 (M.D.N.C. 2004). Finally, Plaintiff asserts that according to statistics compiled by the U.S. Department of Justice, considerations of relative court congestion favor keeping the case in North Carolina.[4]

The Court notes that while there is ordinarily a strong presumption in favor of a plaintiff's choice of forum, see Id., that presumption is lessened where a plaintiff files a pre-emptive declaratory judgment action in order to deprive the "'natural plaintiff' -- the one who wishes to present a grievance for resolution by a court," of its choice of forum. See Hyatt Int'l

---

OSHA hearing Plaintiff represented to OSHA that Plaintiff had hired Defendant to create a corporate compliance program.

[4] More specifically, Plaintiff asserts that the Northern District of New York ranks seventh in the nation among district courts in the number of pending cases per judgeship, that is, 726 cases per judge, while this District ranks seventy-first with 318 pending cases per judge.

Corp. v. Coco, 302 F.3d 707, 718 (7th Cir. 2002). In this case, Plaintiff filed its declaratory judgment action a month after receiving a demand letter from Defendant that specifically asked Plaintiff to respond to Defendant within ten days. It is unclear to the Court how Plaintiff responded to this demand letter other than by filing the declaratory judgment action. However, the Court need not find that Plaintiff engaged in impermissible procedural fencing in filing this declaratory judgment action in order to determine that New York is a more proper forum.

The Court further notes that while Plaintiff asserts that the presence of Bill Thrift, Bill Simpson, Carol Levesque, and Steve Bates in North Carolina makes North Carolina a better forum, of those four individuals, only Bill Thrift was involved in actually negotiating the contract with Defendant. While it is true that shifting inconvenience as a sole reason to transfer forums is impermissible, "[n]o matter which forum is selected, one side or the other will be burdened with bringing themselves and their witnesses from [another state]." Scotland Mem'l Hosp., Inc. v. Integrated Informatics, Inc., No. 1:02CV00796, 2003 WL 151852, at *5 (M.D.N.C. 2003) (citations omitted). The Court notes that in this case, however, Plaintiff also has employees who are already in New York who participated in negotiations with Defendant, that is, Rick Collins and Lloyd Robinson. Thus, on balance, the relative ease of access to sources of proof seems to favor shifting this matter to New York.

Many of the other factors to consider when transferring a case do not favor either side in this matter, or are simply not relevant. However, the Court finds that two factors stand out that favor a transfer of venue to New York. First, factor number nine, which concerns a local

11

interest in having localized controversies settled at home, would also seem to favor New York. Plaintiff's primary assertion is that the contract at issue does not apply to North Carolina, nor to any of its other FBO sites outside of New York. Therefore, the position Plaintiff takes in bringing this lawsuit actually supports a transfer given that Plaintiff's argument is that the controversy solely concerns New York and not North Carolina. Second, factor number ten, which concerns the appropriateness in having a trial of a diversity case in a forum that is at home with the state law that must govern the action, also appears to favor a transfer to New York. Given that this is a case brought in diversity, the Court must apply the law of North Carolina with respect to the choice-of-law rules of the state. See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 1021 (1941) (stating that federal courts sitting in diversity must apply conflict of law rules from the state where federal court is based). As such, under North Carolina law, substantive questions of contract construction and interpretation are governed by the law of the state where the contract was made. See Tanglewood Land Co. v. Byrd, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980). Here, there is no question that the contract at issue was made in New York, and so, under North Carolina choice-of-law rules, the contract at issue would be governed by New York law, whether the matter went forward here in North Carolina or in New York. Therefore, while this is a close case, the Court finds for various reasons that, based upon (1) the location of witnesses to the action, (2) the fact that it is Plaintiff's position that the contract solely concerns services performed by Defendant in New York, and (3), the fact that this litigation will be governed by New York law, a transfer of venue to New York would be

12

appropriate pursuant to § 1404(a).

IV. CONCLUSION

Accordingly, the Court finds in its discretion that this matter is better brought in the Northern District of New York. As such, Defendant's Motion to Dismiss, or, in the Alternative, to Transfer Venue [Document #7] is DENIED in part and GRANTED in part. Defendant's Motion to Dismiss based upon personal jurisdiction is DENIED as being moot. However, Defendant's Alternative Motion to Transfer Venue is GRANTED and this action will be transferred to the U.S. District Court for the Northern District of New York.

An Order in accordance with this Memorandum Opinion shall be entered contemporaneously herewith.

This, the 22nd day of November, 2005.

_____<br>
United States District Judge